1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7   SAARMAN CONSTRUCTION, LTD,                Case No.  15-cv-03548-JST

                Plaintiff,
8                                            **ORDER GRANTING IN PART AND**
                                             **DENYING IN PART DEFENDANT'S**
9        v.                                  **MOTION FOR SUMMARY**
                                             **JUDGMENT, AND GRANTING IN**
10  IRONSHORE SPECIALTY INSURANCE            **PART AND DENYING IN PART**
    COMPANY,                                 **PLAINTIFF'S MOTION FOR**
11                                           **SUMMARY JUDGMENT**
                Defendant.
12                                           Re: ECF Nos. 34, 35

13          Before the Court are Defendant Ironshore Specialty Insurance's Motion for Summary

14  Judgment and Plaintiff Saarman Construction's Motion for Partial Summary Judgment.  The Court

15  grants both motions in part and denies both motions in part.

16  I.      BACKGROUND

17          A.      The Condominium Repairs

18          The Westborough Court Condominiums, located in the City of South San Francisco, were

19  developed and constructed in the late 1990's.  ECF No. 34-5 at 2.  Almost immediately after

20  construction, the condominiums experienced significant water intrusion and resultant damage.  Id.

21  In 2006, the Westborough Court Condominiums Homeowner's Association retained Plaintiff

22  Saarman Construction to be the general contractor responsible for conducting various repairs to

23  the exterior of the buildings.  Id.  Saarman subsequently performed this remedial construction

24  work at the property in 2006 and 2007.  See id.; ECF No. 1 at ¶ 14.

25          B.      The Underlying Action

26          John and Stella Lee owned a unit in the Westborough Court Condominiums.  ECF No. 34-

27  5 at 34, ¶ 5.  The Lees leased the unit to Tiffany Jane Molock.  Id. at ¶ 6.  At some point, Molock

28

United States District Court
Northern District of California

found mold in her unit.[1]  In 2011, Molock sued the Lees, the Homeowner's Association, and other defendants in San Mateo County Superior Court.  See id. at 6.  She sought damages for several defects in the unit, including mold, plumbing leaks, and water intrusion.  Id. at 9, ¶ 13.  Molock eventually settled her claims.  ECF No. 34-6 at 5.

The Lees subsequently cross-claimed against Saarman, the Homeowners Association, and the owners of two neighboring units.  See ECF No. 34-5 at 32.  The Lees' cross-complaint alleged that Saarman and its sub-contractors negligently performed repair work to the building, resulting in water intrusion and water damage to the interior of their unit that contributed to mold growth.  ECF No. 34-5 at 43, ¶¶ 34-35 (noting "resulting omnipresent conditions of mold, toxic mold, and biological growth within the perimeter of the building"); ECF No. 34-5 at 54, ¶ 71 ("The cross-defendants' agents and contractors failed to perform and render services to the building . . . and said failures foreseeably caused water and moisture intrusions into the property resulting [sic] the formation of and amplification of toxic mold within the building."); ECF No. 34-5 at 55, ¶ 75 ("As a proximate result of the cross-defendants continuing and intentional trespasses of water and moisture to the property, toxic mold has developed within the property resulting in it being uninhabitable.").  The Lees claimed both bodily injury and property damage.  See id. at 51, ¶ 64 (alleging that the cross-defendants' negligence "deprived the Lees of the safe, healthy and comfortable use of the property [and] were injurious to the health of occupants of the property").  The Lees alleged that they discovered the water damage in June 2011, when they had an environmental firm investigate the property.  Id. ¶¶ 24-25.  In addition, the Lees requested that Saarman and the other cross-defendants indemnify them against any damages ultimately recovered by Molock.  ECF No. 34-5 at 62-63, ¶¶ 104-106.  The Homeowner's Association filed a similar cross-complaint against Saarman, seeking indemnification and contribution from Saarman.  ECF No. 34-7 at 4-6, ¶¶ 4, 6.  Saarman eventually contributed $65,000 to settle the Lees' and the

---

[1] The parties dispute when Molock first discovered mold in her apartment.  Ironshore argues that, according to Molock's complaint, Molock first discovered mold in her apartment in December 2009.  ECF No. 34 at 11; see also ECF 34-5 at 10, ¶ 15.  Saarman argues that, according to the Lees' cross-complaint, Molock did not observe any mold until September 14, 2010.  See ECF No. 66 at 4; see also ECF No. 34-5 at 37, ¶ 16.

1    HOA's claims.  ECF No. 34-2 at 17-18.

2         **C.     The Ironshore Insurance Policy**

3         Ironshore issued Saarman a commercial general liability policy for the policy period of

4    June 30, 2010 to June 30, 2011.  See ECF No. 34-4 at 3.  Under this agreement, Ironshore agreed

5    to indemnify Saarman for "sums that the insured becomes legally obligated to pay as damages

6    because of 'bodily injury' or 'property damage' to which this insurance applies."  Id. at 6.

7    Ironshore also agreed that it would have the "duty to defend the insured against any 'suit' seeking

8    those damages."  Id.  The policy covered "bodily injury" and "property damage" that (1) "is

9    caused by an 'occurrence,'" and (2) "occurs during the policy period."  Id.  In turn, the policy

10   defined "occurrence" as "an accident, including continuing or repeated exposure to substantially

11   the same harmful conditions."  Id. at 18.  In addition, the policy covered "completed operations"—

12   that is, "all 'bodily injury' and property damage' . . . arising out of . . . 'your product' or 'your

13   work' except . . . work that has not yet been completed or abandoned.  ECF No. 34-4 at 3, ¶ 4;

14   ECF No. 34-4 at 18, ¶ 16.

15        The policy includes two coverage exclusions that are potentially relevant to this dispute.

16   First, it contains the following "Mold, Fungi or Bacteria Exclusion" ("Mold Exclusion"), located

17   in an endorsement separate from the main body of the policy:

18
19        Notwithstanding anything to the contrary contained in the policy or
          any endorsement attached thereto, this insurance does not apply to
20        and shall not respond to any claim, demand, or "suit" alleging:

21        1.   "Bodily  Injury,"  "Property  Damage,"  or  "Personal  and
               Advertising Injury" arising out of, in whole or in part, the actual,
22             alleged, or threatened discharge, inhalation, ingestion, dispersal,
               seepage, migration, release, escape or existence of any mold,
23             mildew, bacteria or fungus, or any materials containing them, at
               any time.
24
25        2.   . . . ; or

26
          3.   [A]n obligation to contribute to, share damages with, repay or
27             indemnify someone else who must pay damages, loss, cost or
               expense because of "Bodily Injury," "Property Damage," or
28             "Personal and Advertising Injury" as set forth in 1., 2.a., or 2.b.

above.

Id. at 41.  In turn, the contract defines a "suit" as "a civil proceeding in which damages because of 'bodily injury' [or] 'property damage' . . . to which this insurance applies are alleged." Id. at 19.

Second, the policy includes the following "Continuous or Progressive Injury or Damage Exclusion" ("CP Exclusion"):

> This insurance does not apply to any "bodily injury" or "property damage":
>
> 1. which first existed, or is alleged to have first existed, prior to the inception of this policy. "Property damage" from "your work," or the work of any additional insured, performed prior to policy inception will be deemed to have first existed prior to the policy inception, unless such "property damage" is sudden and accidental and takes place within the policy period [sic] ; or
>
> 2. which was, or is alleged to have been, in the process of taking place prior to the inception date of this policy, even if such "bodily injury" or "property damage" continued during this policy period; or
>
> 3. which is, or is alleged to be of the same general nature or type as a condition, circumstance or construction defect which resulted in '"bodily injury" or "property damage" prior to the inception date of this policy.

Id. at 32.

**D.    Saarman's Tender and Ironshore's Denial**

Saarman's attorney, Paul Lahaderne, notified Ironshore's third-party claims administrator about the Molock cross-complaints in a letter sent on February 3, 2014.[2]  See ECF No. 34-5 at 2. Lahaderne told the claims administrator that "Ms. Molock did not name Saarman Construction as

---

[2] Saarman had a separate insurance policy with American Safety Indemnity Company that covered mold-related claims.  See ECF No. 34-2 at 40, 69 (agreeing to "pay for 'loss' applicable, associated or in connection with 'mold, mildew, or fungus'").  Before Lahaderne tendered the Molock cross-complaints to Ironshore, he tendered them to the claims adjuster for American Safety Indemnity Company on January 13, 2014.  See ECF No. 34-2 at 25 (acknowledging that Saarman's counsel tendered the claim to American Safety Indemnity Company on January 13, 2014).  However, American Safety Indemnity Company denied coverage because Saarman failed to report the claim before the end of the policy term.  See id. at 73, 80.  American Safety Indemnity Company is not a party to the present action.

United States District Court
Northern District of California

a defendant," and that "Ms. Molock's claims regarding the mold on the <u>interior</u> walls have no causal connection to the reconstruction work performed by Saarman on the exterior building envelope." <u>Id</u>. at 3.  He further notified the claims administrator that the Lees' cross-complaint alleged that Saarman's construction activities "resulted in mold infestation in the unit interior." <u>Id</u>. at 4-5.  In addition to mold damage, Lahaderne informed the claims' administrator that the Lees alleged that Saarman's repair work had caused a water leak in the northwest corner of the kitchen that caused property damage as well as a "threshold leak." <u>Id</u>. Lahaderne, however, disputed that Saarman's work to the exterior of the building caused the water intrusion and mold-related damage to the interior of the building.  <u>See id</u>. Lahaderne attached both Molock's initial complaint and the Lees' cross-complaint to the letter.  <u>See id</u>. at 6, 32.  Lahaderne subsequently responded to the claim examiner's requests for more information and provided supplemental documentation related to the <u>Molock</u> action, including the Homeowner's Association's cross-complaint.  <u>See</u> ECF Nos. 34-6; 34-7.

On August 21, 2014, Ironshore informed Saarman that it refused to defend or indemnify Saarman in the <u>Molock</u> action.  ECF No. 34-9 at 3.  Ironshore declined coverage based on both the Mold Exclusion and CP Exclusion in the policy.  <u>Id</u>. at 8-9. First, Ironshore explained that Saarman completed its work on the properties prior to the policy inception date and, therefore, coverage was excluded by the CP Exclusion.  <u>Id</u>. at 8.  Second, Ironshore explained that coverage was independently excluded by the Mold Exclusion because Molock alleged in her complaint that she sustained personal injury and property damage caused by the presence of mold in her unit.  <u>Id</u>. at 9.

### E.    Procedural History

On July 31, 2015, Saarman filed the present action against Ironshore.  ECF No. 1. Saarman's Complaint alleges that Ironshore improperly refused to provide Saarman with a defense regarding the two cross-complaints in the <u>Molock</u> action.  <u>Id</u>. at ¶ 36.  Saarman asserts that Ironshore's refusal to defend was a breach of contract and a breach of the implied covenant of good faith and fair dealing.  <u>Id</u>. at ¶¶ 45, 53.  Saarman also seeks a declaration that Ironshore has a duty to defend Saarman.  <u>Id</u>. at 64.

## II.     JURISDICTION

This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332(a)(1) because the named parties are diverse and the amount in controversy exceeds $75,000.  ECF No. 1, ¶¶ 1, 2, 5.

## III.    LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(A).  A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  A fact is "material" if the fact may affect the outcome of the case. Id.  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir.1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir.2000).  Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir.2000).

The non-moving party must "identify with reasonable particularity the evidence that

1  precludes summary judgment." <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir.1996).  It is not the

2  duty of the district court to "to scour the record in search of a genuine issue of triable fact."  <u>Id.</u>

3  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for

4  summary judgment; rather, the nonmoving party must introduce some significant probative

5  evidence tending to support the complaint."  <u>Summers v. Teichert & Son, Inc.</u>, 127 F.3d 1150,

6  1152 (9th Cir.1997) (citation and internal quotation marks omitted).  If the non-moving party fails

7  to make this showing, the moving party is entitled to summary judgment.  <u>Celotex Corp. v.

8  Catrett</u>, 477 U.S. 317, 323 (1986).

9  **IV.    ANALYSIS**

10          Saarman has asserted three claims against Ironshore: (1) breach of contract; (2) breach of

11  the implied covenant of good faith and fair dealing; and (3) claim for declaratory relief that

12  Ironshore has a duty to defend Saarman.  Ironshore moves for summary judgment in its favor on

13  all three claims, and Saarman moves for summary judgment in its favor with respect to the first

14  two claims.  The Court will address each of the claims in turn.

15          **A.    Breach of Contract Claims**

16                  **1.    Duty to Defend**

17          First, Saarman argues that Ironshore owed Saarman a duty to defend it in the underlying

18  construction defect action, and that Saarman accordingly breached its contract with Saarman by

19  refusing to defend it.  In response, Ironshore argues that it did not have a duty to defend Saarman

20  in the underlying action because either the Mold Exclusion or the CP Exclusion negated any

21  potential coverage.

22          An insurer has a duty to defend its insured against claims that are potentially covered under

23  the insurance policy.  <u>See</u> <u>Horace Mann Ins. Co. v. Barbara B.</u>, 4 Cal.4th 1076, 1081 (1993); <u>Gray

24  v. Zurich Ins. Co.</u>, 65 Cal.2d 263, 275 (1966) ("[T]he carrier must defend a suit which *potentially*

25  seeks damages within the coverage of the policy.").  This duty to defend is "measured by the

26  nature and kinds of risks covered by the policy."  <u>Waller v. Truck Ins. Exch., Inc.</u>, 11 Cal. 4th 1,

27  19 (1995), <u>as modified on denial of reh'g</u> (Oct. 26, 1995).  "[W]here there is no potential for

28  coverage, there is no duty to defend."  <u>La Jolla Beach & Tennis Club, Inc. v. Indust. Indem. Co.</u>, 9

United States District Court
Northern District of California

1   Cal.4th 27, 39 (1994).  "The burden is on an insured to establish that the occurrence forming the

2   basis of its claim is within the basic scope of insurance coverage."  Aydin Corp. v. First State Ins.

3   Co., 18 Cal. 4th 1183, 1188 (1998), as modified on denial of reh'g (Oct. 14, 1998).  "And, once an

4   insured has made this showing, the burden is on the insurer to prove the claim is specifically

5   excluded."  Id.  If met, the burden shifts back to Saarman to prove that an exception to the

6   exclusion nevertheless affords coverage.  Id. at 1194.

7          To determine whether there was potential coverage, and thus a duty to defend, courts

8   generally compare the allegations in the underlying complaint with the terms of the insurance

9   policy.  See Montrose Chem. Corp. v. Superior Court, 6 Cal. 4th 287, 295 (1993).  However,

10  "facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility

11  that the claim may be covered by the policy."  Id.  By the same token, extrinsic evidence may

12  defeat the duty to defend if "such evidence presents undisputed facts which conclusively eliminate

13  a potential for liability."  Id. at 298-99 (internal quotation marks omitted).  In other words, "[i]f

14  any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the

15  insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is

16  not extinguished until the insurer negates all facts suggesting potential coverage."  Scottsdale Ins.

17  Co. v. MV Transp., 36 Cal. 4th 643, 655 (2005).  "On the other hand, if, as a matter of law, neither

18  the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to

19  defend does not arise in the first instance."  Id.  "[T]he duty to defend is determined by the

20  information possessed by the insurer at the time it refuses to defend, not by information

21  subsequently obtained."  Amato v. Mercury Cas. Co., 18 Cal. App. 4th 1784, 1787 (1993).

22          If the insurer had a duty to defend, that duty "continues 'until [the insurers] can

23  conclusively refute th[e] potential' that liability will arise under the policies."  Nat'l Union Fire

24  Ins. Co. of Pittsburgh, Pa. v. Seagate Techs., Inc., 466 F. App'x 653, 655 (9th Cir. 2012) (quoting

25  Montrose, 24 Cal.Rptr.2d 467).  This places a "high burden" on the insurer.  Id.  A defense is

26  excused only when "the third party complaint can by no conceivable theory raise a single issue

27  which could bring it within the policy coverage."  Montrose, 6 Cal.4th at 295.  "[T]he insured

28  need only show that the underlying claim may fall within the policy coverage; the insurer must

8

prove it cannot." Id. at 300.  On a motion for summary judgment on the insurer's duty to defend, an insurer must be able to negate coverage as a matter of law.  Maryland Cas. Co. v. Nat'l Am. Ins. Co of Calif., 48 Cal. App. 4th 1822, 1832 (1996).

When interpreting an insurance policy to determine potential coverage, courts apply "the ordinary rules of contractual interpretation."  Bank of the W. v. Superior Court, 2 Cal. 4th 1254, 1264 (1992).  "If contractual language is clear and explicit, it governs."  Id. (citing Cal. Civ. Code, § 1638); see also Buss v. Superior Court, 16 Cal. 4th 35, 45, 939 P.2d 766 (1997) ("Where it is clear, the language must be read accordingly.").  If the contractual language is ambiguous, "it must be read in conformity with what the insurer believed the insured understood thereby at the time of formation and, if it remains problematic, in the sense that satisfies the insured's objectively reasonable expectations."  Buss, 16 Cal. 4th at 45; see also Gray, 65 Cal. 2d at 269 ("In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.").  California courts "do not add to, take away from, or otherwise modify a contract for public policy considerations."  Aerojet-Gen. Corp. v. Transp. Indem. Co., 17 Cal. 4th 38, 75-76 (1997) (internal quotation marks omitted), as modified on denial of reh'g (Mar. 11, 1998).

### a.    What to Consider in the Duty to Defend Analysis

As a preliminary matter, Saarman argues that "[t]he allegations of mold in the Molock complaint are irrelevant and immaterial to Ironshore's duty to defend Saarman as to either the Lee cross-complaint or the HOA [Homeowner's Association] cross-complaint" because Saarman was not named as a defendant in the Molock complaint.  ECF No. 35 at 17-18.  The Court finds this argument unpersuasive.  Even if the Molock complaint did not name Saarman as a defendant, Ironshore was allowed to consider "facts extrinsic to the complaint," including the underlying allegations that prompted the Lees and the Homeowner's Association to seek indemnification from Saarman, to determine whether there was potential coverage.  Montrose, 6 Cal. 4th 287 at 298-99.  The Court therefore considers both the allegations in the cross-complaints against Saarman and the extrinsic evidence available to Ironshore at the time to determine whether

United States District Court
Northern District of California

1  Ironshore had a duty to defend Saarman.

2  **b.      Basic Scope of Coverage**

3          Saarman has introduced evidence showing that the cross-complaints included allegations

4  of water intrusion and water damage resulting from Saarman's repair work that was within the

5  basic scope of coverage.  The Lees' cross-complaint alleged that Saarman negligently repaired the

6  exterior of the building and, as a result, this caused water intrusion and property damage.  ECF

7  No. 34-5 at 43, ¶¶ 34-35, 71.  As early as February 3, 2014, Lahaderne informed Ironshore that

8  "the Lees' experts have and [sic] presented evidence that there are at least 2-3 areas of water

9  intrusion due to deficiencies in work performed by Saarman (and/or subcontractor Shapiro

10 Plastering), which have resulted in tangible property damage to the unit interiors and fixtures."

11 ECF No. 34-7 at 3.  In a subsequent letter sent to Ironshore on March 28, 2014, Lahaderne

12 informed Ironshore that there was "water intrusion into her unit with resultant property damage."

13 ECF No. 34-6 at 5.  And, based on expert opinions, Lahaderne informed Ironshore that "[t]here is

14 clear evidence of water intrusion which appears at this location."  ECF No. 34-6 at 9.  These

15 claims for water damage clearly fell within the basic scope of coverage under Ironshore's policy,

16 which covers sums that Saarman became obligated to pay because of "property damage" caused

17 by an occurrence that occurred during the policy period.  See ECF No. 34-4 at 3.  As a result, the

18 burden shifted to Ironshore to prove that this claim was specifically excluded and therefore, that

19 there was no potential coverage under the policy.  Aydin, 18 Cal. 4th at 1188.

20 **c.      Mold Exclusion**

21         First, Ironshore argues that the Mold Exclusion eliminated any potential coverage for

22 Saarman's claim such that there was no duty to defend.  ECF No. 34 at 17.  Ironshore points out

23 that the Mold Exclusion broadly bars coverage for "any claim, demand, or 'suit' alleging . . .

24 'Bodily Injury,' [or] 'Property Damage'. . . arising out of, in whole or in part, the actual, alleged,

25 or threatened . . . existence of any mold. . . ."  Id.  Ironshore argues that this exclusionary language

26 clearly and unmistakably bars any potential coverage not just for "claims" that include mold

27 allegations, but also any "suit" that includes mold allegations, either in whole or in part.  Id. at 17.

28

United States District Court
Northern District of California

1    Because the Molock action was such a "suit,"[3] Ironshore argues that the Mold Exclusion applies,

2    thus eliminating any possibility of coverage with respect to the entire underlying "suit." Id. at 17-

3    19.

4              In response, Saarman argues that the Mold Exclusion did not relieve Saarman of its duty to

5    defend because the cross-complaints also included claims for water intrusion and water damage,

6    separate and apart from the mold damage, that were potentially covered under the policy.  ECF

7    No. 66 at 10, 12-13.  Based on the water intrusion claim, Saarman argues that Ironshore had a duty

8    to defend the *entire* underlying action, including the uncovered mold claim.  Id. at 10-11.  To

9    support its argument, Saarman relies primarily on cases in which the California Supreme Court

10   has held that "[o]nce the defense duty attaches, the insurer is obligated to defend against all of the

11   claims involved in the action, both covered and noncovered."  Horace Mann Ins. Co. v. Barbara

12   B., 4 Cal. 4th 1076, 1081, 1084 (1993), as modified on denial of reh'g (May 13, 1993) ("We look

13   not to whether noncovered acts predominate in the third party's action, but rather to whether there

14   is *any* potential for liability under the policy.").

15             There is some tension between the plain terms of the insurance contract—which clearly bar

16   coverage for any "suit" that includes mold allegations, even if there are other potentially covered

17   claims within that suit—and California case law which holds that insurers have a duty to defend a

18   mixed action if there is any potentially covered claim, even if the action includes uncovered

19   claims.  On the one hand, California courts enforce clear and explicit contractual language

20   contained in insurance exclusions.  Bank of the W., 2 Cal. 4th at 1264 (citing Cal. Civ. Code, §

21   1638).  On the other hand, the California Supreme Court has held that in a "mixed action"—i.e. an

22

23   _____

3 Both Molock's complaint and the Lees' cross-complaint included mold allegations.  See, e.g.,
24   ECF No. 34-5, Ex. 2 at 55, ¶¶ 71, 75 (alleging that "[t]he cross-defendants' agents and contractors
     failed to perform and render services to the building and devices therein . . . and said failures
25   foreseeably caused water and moisture intrusions into the property resulting [sic] the formation of
     and amplification of toxic mold within the building . . . As a proximate result of the cross-
26   defendants continuing and intentional trespasses of water and moisture to the property, toxic mold
     has developed within the property resulting in it being uninhabitable.").  Saarman's defense
27   counsel admitted as such in his deposition.  See ECF No. 34-2, Ex. 2 at 13:18-23 (responding "I
     believe that's correct" after being asked whether "the Lees made the claim that Saarman was
28   somehow responsible for the mold in Ms. Molock's unit").

1   action that includes both potentially covered and uncovered claims—"the insurer has a duty to

2   defend the action in its entirety." Buss, 16 Cal. 4th at 48.  This is so because the *claim*, and not the

3   entire lawsuit, is the proper unit of analysis for determining whether the duty to defend is

4   triggered.  See id. ("As stated, the duty to defend goes to any action seeking damages for any

5   covered claim.  If it went to an action *simpliciter*, it could perhaps be taken to reach the action *in*

6   *its entirety*.  But it does not.").  And this "prophylactic[]" duty to defend mixed actions prevents

7   insurers from wasting time dividing potentially covered claims from uncovered claims in a way

8   that would hamper an immediate and meaningful defense.  Id. at 48-49.

9          At oral argument on these motions, the parties acknowledged that California courts have

10   not squarely addressed the effect that a mold exclusion like the one at issue—which bars coverage

11   for any "suit," not just any "claim," in which mold damages are alleged, either in whole or in

12   part—has on otherwise covered claims.[4]  This Court must therefore determine how the California

13   Supreme Court is likely to decide this state law issue of first impression.  See In re K F Dairies,

14   Inc. & Affiliates, 224 F.3d 922, 924 (9th Cir. 2000).

15          The Court finds the reasoning in Mount Vernon Fire Ins. Co. v. Creative Housing, Ltd.

16   persuasive on this issue.  88 N.Y. 2d 347 (N.Y. Ct. App. 1996).  In that case, a woman who was

17   assaulted in an apartment building sued the owner of the building for negligence.  Id. at 349-50.

18   In turn, the building owner sought defense and indemnification in the underlying suit from its

19   insurer.  Id.  The insurer sued in federal district court seeking declaratory judgment that it did not

20   owe the building owner a duty to defend, relying on language in its policy that excluded coverage

21   "for any claim, demand or suit based on Assault and Battery."  Id. at 350.  On appeal, the Second

22   Circuit certified several issues of state law to the New York Court of Appeal.  Id. at 350-51.  The

23

24   _____

[4] The broad exclusionary language in this Mold Exclusion—which bars coverage in any suit in
25   which mold-related damage is alleged, not just coverage for mold-related damages—distinguishes
     this case from the cases cited by Saarman.  Cf. Schmitt v. NIC Ins. Co., No. C 06-5837 MHP,
26   2007 WL 3232445, at *2, n. 7 (N.D. Cal. Nov. 1, 2007) (providing that "[t]his insurance does not
     apply to: 'Bodily injury,' 'property damage,' . . . arising out of, resulting from, or caused by or
27   contributed to by any fungus, mildew, or mold"); Tower Ins. Co. v. Dockside Associates Pier 30
     LP, 834 F. Supp. 2d 257, 264-65 (E.D. Pa. 2011) ("[T]he mold exclusion does not act as a
28   complete bar to coverage, but only excludes coverage for damage caused by mold.").

United States District Court
Northern District of California

New York Court of Appeal applied a "but-for" test to the exclusion: "if no cause of action would exist but for the assault, the claim is based on assault and the exclusion applies." Id.  In other words, the exclusion applied if "the negligence claim could not be established without proving the underlying assault." Id. at 351-52.  The court reasoned that, although the plaintiff had alleged negligence (a covered claim), that cause of action would not have existed but for the assault (an uncovered claim). Id. Therefore, the court concluded that the "claim [was] based upon an assault for which coverage is excluded." Id.

Ironshore acknowledges that the assault and battery exclusion in Mount Vernon "has some similarities with the Ironshore mold exclusion." ECF No. 81 at 3-4.  Notably, both exclusions use the phrase "claim, demand, or suit." Id.  However, Ironshore argues that Mount Vernon should not apply here for two reasons. Id.  First, Ironshore argues that the New York court applied the "but-for" test to determine what the suit was "based on." Id.  Ironshore argues that such a determination is not necessary in this case because coverage under its policy does not hinge on what the suit is "based on." Id.  Rather, Ironshore's policy bars coverage for any suit that alleges mold-related damages either "in whole or in part." Id.  Second, Ironshore argues that Mount Vernon does not apply because California courts have adopted a broader definition of "arising out of" than New York courts. Id. at 4.  Neither argument is persuasive.

To the extent Ironshore relies on the language in the Mold Exclusion to evade its duty to defend mixed actions that include covered claims, that language contradicts California law.  As the California Supreme Court explained in Buss, "in a 'mixed' action, the insurer has a duty to defend the action *in its entirety*." Buss, 16 Cal. 4th at 48 (emphasis added).  Here, Ironshore has attempted to circumvent that principle by hinging its duty to defend on the presence of any allegations of non-covered damage in the "suit"—no matter how small or inconsequential those allegations may be.  However, the court in Buss suggested that insurers could not contract around their duty to defend mixed actions in this way.  The court explained that this obligation is not even rooted in the contractual language itself, but rather is "imposed by law in support of the policy." Id.; see also State Farm Gen. Ins. Co. v. Mintarsih, 175 Cal. App. 4th 274, 286 (2009) ("[T]he duty to defend claims in a 'mixed' action that are not potentially covered is not a contractual

1    duty.").  In short, Ironshore cannot contract around California law that requires insurers to defend

2    the entire action if there is any potentially covered claim.  Because the language in the mold

3    exclusion barring coverage for "any claim, demand, or 'suit' alleging [damage] arising out of, in

4    whole or in part, the . . . alleged . . . existence of any mold" tries to do precisely that, it is

5    unenforceable.

6          The "but-for" test also has close parallels to other facets of California insurance law.  For

7    example, California courts require coverage when two negligent acts on the part of the insured—

8    one covered and one not covered—concurrently cause damages for which the insured seeks

9    indemnification.  See State Farm Mut. Auto. Ins. Co. v. Partridge, 10 Cal. 3d 94, 98, 102, 104-05

10   (1973).[5]  In Partdige, for example, the California Supreme Court held that the insurer was liable

11   where the insured's negligent modification of a gun to have a "hair trigger action" (a covered act)

12   and the insured's negligent driving (a non-covered act) simultaneously caused a passenger in the

13   car to be shot.  Id.  The court explained that "although the accident occurred in a vehicle, the

14   insured's negligent modification of the gun suffices, in itself, to render him fully liable for the

15   resulting injuries."  Id. at 103.  In other words, the plaintiff in the underlying negligence suit

16   would have had a cause of action even if the insured had not engaged in uncovered conduct—i.e.

17   the insured's liability existed "independently" of the uncovered conduct.  Id.  The court further

18   explained that the insurer was "attempting to escape liability under the homeowner's policy

19   simply because, in the instant case, both negligent acts happened to have been committed by a

20   single tortfeasor."  Id.  The same rationale applies here, and even if Saarman's conduct is

21   categorized as a single negligent act that results in two categories of damages – one category that

22   is covered and one category that is not covered – there is no reason not to apply the same analysis.

23   _____

24   [5] Saarman also relies on Howell v. State Farm Fire & Casualty Co., 218 Cal. App. 3d 1446 (1990).
     However, shortly before that case was decided the California Supreme Court held that the
25   concurrent proximate cause doctrine only applies to third party liability cases, not first-party
     property policy cases like Howell.  See Garvey v. State Farm Fire & Cas. Co., 48 Cal. 3d 395,
26   399, 410 (1989) (recognizing "the important distinction between property loss coverage under a
     first-party property policy and tort liability coverage under a third-party liability insurance policy"
27   and holding that the lower court "erroneously failed to limit at the threshold the application of
     Partridge to the third party liability context").  Therefore, the Court does not consider the Howell
28   case in its analysis.

United States District Court
Northern District of California

The "but-for" test prevents insurers from escaping their duty to defend mixed actions simply because the negligent act happened to result in uncovered damage as well as covered damage.  In sum, the "but-for" test balances the undisputed need to enforce the clear contractual language of a policy exclusion, on the one hand, with California law that requires insurers to defend the entire action if there is a potentially covered claim, on the other hand.  Therefore, the Court applies the "but-for" test to the case at hand.

Applying the "but-for" test to the Mold Exclusion at issue in this case, Ironshore had a duty to defend Saarman in the underlying suit based on the potentially covered water intrusion/water damage claim.  This is because the Lees' cause of action for negligence against Saarman for water intrusion and damage would have existed even if there were no mold allegations—i.e. it exists "independently" of the mold allegations.  In other words, the Lees could have established a negligence claim against Saarman based on water intrusion/water damage alone (which is potentially covered) without proving mold damage (which is not covered).  Because the water damage claim was potentially covered, the duty to defend attached and Ironshore "is obligated to defend against all of the claims involved in the action, both covered and noncovered." Horace Mann, 4 Cal. 4th at 1081.  Ironshore may not evade this duty to defend simply because Saarman's covered negligent act happened to result in allegations of mold damage as well as water damage.  Such a result would frustrate the reasonable expectations of policy holders by depriving them of their contractual right to a defense for potentially covered claims simply because the plaintiff in the underlying suit decided to include additional allegations of damage that are not covered under the policy.

### d.      CP Exclusion

Next, Ironshore argues that the policy's CP exclusion barred any potential coverage and therefore negated any duty to defend.  ECF No. 34 at 19-24.

### i.      Paragraph 1

Paragraph 1 of the CP exclusion bars coverage for "continuous or progressive injury or damage" which "first existed, or is alleged to have first existed, prior to the inception of this policy."  ECF No. 34-4 at 32.  That paragraph also states that damage resulting from the insured's

United States District Court
Northern District of California

work "performed prior to policy inception *will be deemed to have first existed prior to the policy inception*, unless such 'property damage' is sudden and accidental and takes place within the policy period." Id. (emphasis added).  Ironshore argues that it is undisputed that Saarman completed its work on the project no later than 2007, while the inception date of the Ironshore policy is June 30, 2010.  ECF No. 34 at 19-24.  Therefore, Ironshore argues, the water intrusion damage is deemed to have first existed prior to the policy period and there is no potential for coverage.  See id.; see also ECF No. 65 at 13.

Saarman does not dispute that it finished its repair work on the property by 2007 at the latest, several years before the policy inception date of June 30, 2011.  ECF No. 1 at ¶ 14; ECF No. 66 at 16.  Therefore, the CP exclusion automatically deems any damage resulting from that work to have first existed prior to the policy inception, unless the water damage was "sudden and accidental."  ECF No. 34-4 at 32.  Saarman does not argue that the water damage was sudden and accidental.  Instead, Saarman argues that "the deemer clause does not relieve Ironshore of its duty to defend" because it is unenforceable.  ECF No. 66 at 15; ECF No. 35 at 16-17.  Saarman argues that "the Ironshore policy is ambiguous as to the operative event on which property damage coverage is conditioned" and therefore should be construed broadly in favor of coverage.  ECF No. 66 at 15-16; ECF No. 35 at 16-17.  The Court agrees.

"An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are *reasonable*."  Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 5 Cal. 4th 854, 867 (1993).  "Because the insurer writes the policy, it is held 'responsible' for ambiguous policy language, which is therefore construed in favor of coverage."  Montrose Chem. Corp. v. Admiral Ins. Co., 10 Cal. 4th 645, 667 (1995), as modified on denial of reh'g (Aug. 31, 1995); see also Pennsylvania Gen. Ins. Co. v. Am. Safety Indem. Co., 185 Cal. App. 4th 1515, 1526–27 (2010) ("When construing an insurance policy, we must resolve ambiguities in coverage clauses most broadly in favor of coverage, and we concomitantly must narrowly construe exclusions and limitations on coverage.").

To support its argument, Saarman relies primarily on Pennsylvania Gen. Ins. Co. v. American Safety Indem. Co., 185 Cal. App. 4th 1515 (2010).  In that case, a California Court of

16

Appeal held that the term "occurrence" in the policy was ambiguous because it did not clearly

specify whether the causal act or the resulting damage was the operative act triggering potential

coverage.  Id. at 1526-27.  The policy defined a covered "occurrence" in the following way:

> Occurrence' means 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions that happens during the term of this insurance.  'Property damage' . . . which commenced prior to the effective date of this insurance will be deemed to have happened prior to, and not during, the term of this insurance.

Id. at 1524-25.  The insurance company argued that this definition of "occurrence" unambiguously

required both that the causal *act* occurred during the policy period (based on the phrase "happens

during the term of this insurance") and that the resulting *damage* occurred during the policy period

(based on the deemer clause regarding property damage).  Id. at 1526.  However, the court

explained that the deemer clause about property damage modified the preceding clause in such a

way that it created an ambiguity: "The newly added language, after stating that the occurrence

must 'happen[ ] during the term of this insurance,' then immediately expands upon and refines the

definition by explaining what would be deemed *not* to have constituted an 'occurrence ... that

happens during the term of this insurance.'"  Id. at 1527.  The court therefore concluded that the

language "lends itself to the interpretation that what must occur to qualify as an occurrence *is*

property damage during the term of the policy, and there is nothing in the . . . language clearly

stating the causal conduct must *also* occur during the policy period."  Id.  The court also pointed to

other provisions in the policy that buttressed this interpretation.  Id.  For example, the policy's

"Pre-Existing Injury or Damage Exclusion" used the term "occurrence" to refer to the damage, not

the causal act that produced the damage.  Id.  And the policy's "products-completed operations

hazard" reinforced this reasonable interpretation because completed operations coverage

"ordinarily is conditioned on damage occurring during the policy period, as long as the work was

completed before the damage occurred, and is not conditioned on *when* the work was completed."

Id. at 1532-33 (citing 3 Cal. Insurance Law & Practice (2010) Construction Insurance, § 37.05[7]

(2009 rev.)).  The court noted that the "[t]he protection provided by this products-completed

operations hazard appears to require three conditions: there was property damage, it arose out of

your work, and your work has been completed." Id. (internal quotation marks omitted).  The court

opined that "[t]here is certainly nothing in the products-completed operations hazard that suggests

the second element—the insured's work caused the damage—was itself subject to a *fourth*

condition that the insured's work happened during the policy period." Id.  Based on all of the

above, the court concluded that "the policy was reasonably susceptible of the interpretation that

the trigger of coverage was not when the insured completed its work, but was instead based on

when the damages caused by the negligent causal acts of the insured first commenced." Id.

Because there was a factual dispute as to when those damages first commenced, the court reversed

the trial court's summary judgment order.  Id. at 1532-34.

Here, the policy language is similarly ambiguous regarding what triggers coverage for

continuous damage that results from the insured's completed work.  The general coverage

provisions on the first page of the policy purport to provide coverage for "'bodily injury' or

'property damage' to which this insurance applies" and, in turn, the "insurance applies to 'bodily

injury' or 'property damage' only if . . .[it] is caused by an 'occurrence' [and] [t]he 'bodily injury'

or 'property damage' occurs during the policy period." ECF No. 34-4 at 6.  An "occurrence" is

defined as "an accident, including continuous or repeated exposure to substantially the same

general harmful conditions." Id. at 18.  The general coverage provisions therefore suggest that

coverage for "continuous . . . exposure to substantially the same general harmful conditions" is

triggered if the *damage* occurs during the policy period.  In contrast, the deemer clause in the

"continuous or progressive injury or damage exclusion" conditions coverage on whether the

insured's wrongful *act*, and not the damages flowing from that act, occurred during the policy

period: "'Property damage' from *'your work'* . . . *performed prior to policy inception* will be

deemed to have first existed prior to the policy inception."   ECF No. 34-4 at 32 (emphasis added).

As in Pennsylvania General, the deemer clause modifies the general coverage clause in a way that

creates ambiguity regarding the trigger of coverage for continuous damage.  And, like in

Pennsylvania General, this ambiguity is amplified when viewed alongside the provision of the

policy that covers "completed operations"—that is, "all 'bodily injury' and property damage' . . .

arising out of . . . 'your product' or 'your work' except . . . work that has not yet been completed

1    or abandoned.  ECF No. 34-4 at 3, ¶ 4; ECF No. 34-4 at 18, ¶ 16.  That provision imposes just

2    three requirements for completed operations coverage and, as the court in Pennsylvania General

3    noted, "[t]here is certainly nothing in the products-completed operations hazard that suggests the

4    second element—the insured's work caused the damage—was itself subject to a *fourth* condition

5    that the insured's work happened during the policy period."  Id.  In sum, when viewed as a whole,

6    the policy language was reasonably susceptible to the interpretation that the trigger of coverage for

7    continuous damage was not when the insured completed its work, but rather when the damages

8    caused by the negligent causal acts of the insured first commenced.

9         Ironshore argues that Pennsylvania General does not apply here because Ironshore's policy

10   contains "materially different policy language."  ECF No. 71 at 11-12.  The argument is not

11   supported by the record – the definition of an "occurrence" in the policy at issue in Pennsylvania

12   General is substantially similar to definition of an "occurrence" in Ironshore's policy.  Compare

13   Pennsylvania Gen. Ins. Co., 185 Cal. App. 4th at 1524-25 ("'Occurrence' means 'an accident,

14   including continuous or repeated exposure to substantially the same general harmful conditions

15   that happens during the term of this insurance.") with  ECF No. 34-4 at 6 (defining an

16   "occurrence" as "an accident, including continuous or repeated exposure to substantially the same

17   general harmful conditions.").  And the completed operations provision is identical.  Although

18   Ironshore's clause conditioning coverage on the causal act appears in an exclusion, and not within

19   the definition of an "occurrence" as in Pennsylvania General, that difference is not material to the

20   ambiguity analysis.  In both cases, the clause conditions coverage on the time of the causal act,

21   and therefore conflicts with another provision in the policy that conditions coverage on the time

22   that damages occurred.  And in both cases the provision covering completed operations supports

23   the reasonable interpretation that coverage was triggered if the damages resulting from the

24   completed work occurred during the policy period, regardless of whether the work itself was

25   completed during the policy period.

26        Because the trigger of coverage for continuous damage is ambiguous, any doubts as to

27   meaning must be resolved against Ironshore.  Gray, 65 Cal. 2d at 269.  Construing the coverage

28   clauses broadly in favor of coverage and the exclusions narrowly, the policy covered continuous

United States District Court
Northern District of California

19

1   damage resulting from Saarman's completed work if the damages first existed, or were alleged to

2   have first existed, during the policy period.

3          At the time of Ironshore's denial, both the Lees' cross-complaint and extrinsic evidence

4   available to Ironshore suggested that the water damage first existed during the policy period and,

5   therefore, was potentially covered by the policy.  Scottsdale Ins. Co., 36 Cal. 4th at 655.  The Lees

6   alleged that they discovered the water damage in June 2011, when they had an environmental firm

7   investigate the property.  ECF No. 34-5 ¶¶ 24-25.  The Ironshore policy was in effect at that time

8   and had been in effect for the entire year preceding the investigation.  In addition, Lahaderne

9   informed Ironshore on March 28, 2014 that there was "new evidence that there is water intrusion

10  at the base of the east entry wall, which starts at the deck/wall juncture (where Saarman performed

11  sealant repairs) and 'wicking' upward.'"  ECF No. 34-6 at 10.  Later, when requesting

12  reconsideration of Ironshore's denial, Lahaderne attached a declaration from the Housing

13  Authority's expert Tom Hacker, who opined that "[b]ased on [his] investigation, it is [his] opinion

14  that the leaks at the northeast kitchen corner did not begin after completion of Saarman's

15  Reconstruction work performed circa 2005-2006, but have developed more recently."  ECF No. 55

16  at 7-8.  Specifically, Hacker explained that "[b]ased on the nature of the staining and damage to

17  the particleboard on the kitchen cabinets, it is [his] opinion that this is recent and *it is more*

18  *probable than not that the water intrusion began to manifest itself and cause the damage during*

19  *the one-year period prior to . . . June 24, 2011.*  Id. (emphasis added).  The apparent overlap of the

20  Ironshore policy period and the alleged water damage, as well as extrinsic evidence suggesting

21  that the water damage occurred during the policy period, revealed a possibility that the water

22  damage claim was covered by the policy.  As a result, Ironshore had a duty to defend Saarman in

23  the action.  None of the allegations in Molock's underlying complaint "negate[] all facts

24  suggesting potential coverage," and therefore they did not extinguish Ironshore's duty to defend.

25  Scottsdale, 36 Cal. 4th at 655.

26                          **ii.      Paragraph 2**

27          Next, Ironshore argues that Paragraph 2 of the CP exclusion bars coverage.  ECF No. 34 at

28  21.  That paragraph bars coverage for damage "which was, or is alleged to have been, in the

1    process of taking place prior to the inception date of this policy, even if such [damage] continued

2    during this policy period." <u>Id</u>.  Although the Molock complaint alleged that the water damage

3    took place no later than December 2009, the Lees' cross-complaint and the expert opinion

4    suggested that there were new leaks and water damage in the unit that were not in the process of

5    taking place prior to the policy period.  ECF No. 55 at 7-8.  Given this factual dispute, Saarman

6    has shown that the water damage claim was at least potentially covered under the policy, and

7    Ironshore has not negated that potential coverage as a matter of law.  <u>Montrose</u>, 6 Cal.4th at 300;

8    <u>Maryland Cas. Co.</u>, 48 Cal. App. 4th at 1832.

9                               **iii.        Paragraph 3**

10          Finally, Ironshore relies on Paragraph 3 of the CP exclusion to negate any potential

11   coverage and thus its duty to defend.  ECF No. 34 at 21.  That paragraph bars coverage for damage

12   "which is, or is alleged to be of the same general nature or type as a condition, circumstance or

13   construction defect which resulted in 'bodily injury' or 'property damage' prior to the inception

14   date of this policy."  ECF No. 34-4 at 32.  Again, both the Lees' cross-complaint and the expert

15   opinion suggested that there was new water damage that occurred during the policy period that

16   was different than damage that might have occurred before the policy period.  Saarman's claims

17   were still potentially covered under the policy, and Ironshore therefore owed it a defense duty until

18   it could "conclusively refute th[e] potential that liability will arise under the policies."  <u>Nat'l Union</u>

19   <u>Fire Ins. Co. of Pittsburgh, Pa.</u>, 466 F. App'x at 655 (internal quotation marks omitted).

20                                       * * *

21          In sum, Saarman has produced evidence showing that, as a matter of law, Ironshore owed

22   it a defense duty in the underlying action for both the covered water damage claims and the non-

23   covered mold damage claims.  Ironshore has not met its burden of showing that either the Mold

24   Exclusion or the CP exclusion conclusively negated potential coverage for those claims.  As a

25   result, Ironshore's refusal to defend was a breach of contract.  Accordingly, the Court grants

26   Saarman's motion for partial summary judgment as to its claim for breach of contract based on

27   Ironshore's refusal to defend Saarman, and denies Ironshore's motion for summary judgment with

28   respect to this claim.

United States District Court
Northern District of California

### 2.      Duty to Indemnify

Next, Saarman argues that Ironshore breached its duty to indemnify Saarman in the underlying construction defect action.  Saarman seeks indemnification from Ironshore for its contribution to the settlement of the Lee cross-complaint.  ECF No. 66 at 23.

The duty to indemnify is narrower than the duty to defend.  <u>Buss</u>, 16 Cal. 4th at 46.  "[W]hile an insurer has a duty to defend suits which potentially seek covered damages, it has a duty to indemnify only where a judgment has been entered on a theory which is *actually* (not potentially) covered by the policy."  <u>Palmer v. Truck Ins. Exch.</u>, 21 Cal. 4th 1109, 1120 (1999) (internal citations and quotation marks omitted).  Unlike the insurer's duty to defend, which "runs to claims that are merely potentially covered, in light of facts alleged or otherwise disclosed," "[t]he insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved."  <u>Buss</u>, 16 Cal. 4th at 45-46.  And "[t]he insurer is entitled to summary adjudication that no potential for indemnity exists ... if the evidence establishes as a matter of law that there is no coverage."  <u>Powerine Oil Co. v. Superior Court</u>, 37 Cal. 4th 377, 390 (2005), <u>as modified</u> (Oct. 26, 2005), <u>as modified</u> (Oct. 27, 2005).  Just as the insured may seek indemnity from the insurer for an adverse court judgment, it may also seek indemnity from the insurer if it enters into a reasonable settlement after the insurer improperly refuses to defend it.  <u>Isaacson v. California Ins. Guarantee Assn.</u>, 44 Cal. 3d 775, 791, 750 P.2d 297 (1988), <u>as modified on denial of reh'g</u> (Apr. 6, 1988).  As the insured, Saarman bears the burden of proving that its claim was *actually* covered under the policy to establish indemnity.  <u>Advanced Network, Inc. v. Peerless Ins. Co.</u>, 190 Cal. App. 4th 1054, 1060.

Saarman argues that Ironshore has a duty to indemnify because "the settlement with the Lees encompassed both an insured risk (water damage) and an excluded risk (mold damage)."  ECF No. 66 at 24.  Saarman concedes that the mold claims were not actually covered under the policy, and relies exclusively on the water damage claims to establish Ironshore's duty to indemnify.  However, to prove that its water damage claim was actually covered under the policy, Saarman must show that the water damage "first existed, or is alleged to have first existed, prior to the inception of this policy."  ECF No. 34-4 at 32.  Although Saarman has presented evidence

demonstrating that it was *possible* that the water damage first occurred during the policy period, such that a duty to defend was triggered, there is a genuine dispute of material fact as to whether the water damage *actually* first occurred during the policy period.  Saarman points to evidence suggesting that the water damage first occurred during the policy period, whereas Ironshore points to evidence suggesting that the water damage first occurred before the policy's inception date.  ECF No. 55 at 7-8 (the Homeowner's Association's expert's opinion that at least some of the water damage occurred during the policy period); ECF No. 34-5 ¶ 14 (allegation that Molock first became aware of water intrusion and water damage in December 2009).  In short, there is an unresolved factual dispute as to when the water damage first occurred.[6]  Accordingly, the Court denies Ironshore's motion for summary judgment as to Saarman's claim for breach of the duty to indemnify.

## B.   Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

The duty of good faith and fair dealing prevents insurers from engaging in conduct that would frustrate the insured's receipt of benefits to which they are entitled under the contract.  Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1153 (Ct. App. 1990).  In accordance with this duty, "an insurer must investigate claims thoroughly [and] it may not deny coverage based on either unduly restrictive policy interpretations or standards known to be improper."  Id. at 1148.  "A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim."  Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 721 (2007), as modified (Dec. 19, 2007) (internal quotation marks and citations omitted).  However, "[i]f the insurer's refusal to defend is reasonable, no liability will result."  Campbell v. Superior Court, 44 Cal. App. 4th 1308, 1321 (1996), as modified (May 20, 1996).  And "[s]loppy or negligent claims

---

[6] Ironshore argues that this factual dispute is not material in light of the Mold Exclusion.  It argues that there cannot be actual coverage for *any* of Saarman's claims, including the water damages claim, regardless of when the water damage first existed, because the Mold Exclusion broadly bars coverage for any "suit" in which mold-related damages are alleged.  ECF No. 34 at 22.  Given the Court's resolution of that issue earlier in this order, this argument is unhelpful to Ironshore.

United States District Court
Northern District of California

1    handling does not rise to the level of bad faith." <u>Chateau Chamberay Homeowners Ass'n v.</u>

2    <u>Associated Int'l Ins. Co.</u>, 90 Cal. App. 4th 335, 351 (2001), <u>as modified on denial of reh'g</u> (July 30,

3    2001) (holding that there was no factual issue as to an insurer's bad faith even though the

4    insured's expert argued that the insured could have done a better job in adjusting the insured's

5    claim).

6            Applying these principles to the facts in the record, the plaintiff has demonstrated a triable

7    issue of fact as to whether Ironshore's decision to deny its claim was made unreasonably in bad

8    faith.  Saarman has produced evidence that Ironshore ignored information suggesting that

9    Saarman's water damage claim was potentially covered under the policy.  The Lees' cross-

10   complaint alleged water intrusion and damage that they discovered during the policy period, and

11   Lahaderne provided extrinsic evidence suggesting that the water damage first occurred during the

12   policy period.  This information suggested that at least some of Saarman's claims were potentially

13   covered under the policy.  Nonetheless, Ironshore did not directly address this evidence in its

14   denial letter.  ECF No. 34-9 at 8-9.  However, given the tension between the terms of the policy

15   and California case law regarding the duty to defend mixed actions, and the fact that the

16   interpretation of this specific policy language is a matter of first impression under California law,

17   this Court cannot conclude as a matter of law that Ironshore's denial was made in bad faith.

18   Accordingly, the Court denies both Saarman's and Ironshore's motions for summary judgment

19   with respect to this claim.

20          **C.      Damages**

21          Despite the foregoing, Ironshore argues that summary judgment should be granted on

22   Saarman's breach of contract and bad faith causes of actions because Saarman has no damages.

23   ECF No. 34 at 27.  Ironshore argues that Saarman has not paid post-tender defense costs or

24   contributed to the settlement of the cross-complaints.  <u>Id</u>.  In response, Saarman admits that it has

25   not paid defense fees and costs yet.  ECF No. 66 at 25.  However, Saarman's attorney, Paul

26   Lahaderne, testified that he has sent invoices to Saarman for his services and that he expects to be

27   paid for those services.  ECF No. 34-2 at 45:7-21.  Therefore, Saarman has provided sufficient

28   evidence to show that it suffered damages as a result of Ironshore's wrongful refusal to defend.

United States District Court
Northern District of California

1    Arenson v. Nat'l Auto. & Cas. Ins. Co., 48 Cal. 2d 528, 534–40 (1957) (holding that the insurer

2    was liable for the insured's attorneys' fees and costs where the attorney testified that he had

3    incurred charges in the matter and billed the insured, even though the  attorney had not yet been

4    paid).

5            **D.      Claim for Punitive Damages**

6            "[O]n a motion for summary adjudication with respect to a punitive damages claim, the

7    higher evidentiary standard applies.  If the plaintiff is going to prevail on a punitive damages

8    claim, he or she can only do so by establishing malice, oppression or fraud by clear and

9    convincing evidence."  Basich v. Allstate Ins. Co., 87 Cal. App. 4th 1112, 1121 (2001).  Saarman

10   does not even respond to Ironshore's motion for summary judgment for this claim, let alone point

11   to any evidence in the record that establishes malice, oppression or fraud.  Accordingly, the Court

12   grants Ironshore's motion for summary judgment with respect to this claim.  See id. (affirming the

13   trial court's order granting the motion for summary judgment on the issue of  punitive damages

14   where the plaintiff did not contend that his evidence was sufficient to meet the clear and

15   convincing standard).

16           **E.      Claim for Declaratory Relief**

17           Saarman also seeks a declaration that Ironshore owed Saarman a duty to defend.  However,

18   Ironshore argues that declaratory relief is not appropriate because damages provide an adequate

19   remedy and only past wrongs are involved.  ECF No. 34 at 26.  "Declaratory relief is inappropriate

20   where other adequate remedies are available to redress past conduct."  Philips Med. Capital, LLC

21   v. Med. Insights Diagnostics Ctr., Inc., 471 F. Supp. 2d 1035, 1048 (N.D. Cal. 2007).  After all,

22   "[d]eclaratory relief generally operates prospectively to declare future rights, rather than to redress

23   past wrongs."  Jolley v. Chase Home Fin., LLC, 213 Cal. App. 4th 872, 909 (2013), as modified

24   on denial of reh'g (Mar. 7, 2013) (affirming the lower court's grant of summary judgment as to the

25   plaintiff's claim for declaratory relief because the plaintiff had a "fully matured cause of action"

26   against the defendant, money damages were an adequate remedy, and the cause of action for

27   declaratory relief was redundant of the plaintiff's other claims).  Saarman does not respond to this

28   argument in its opposition brief.  Because Saarman's claims for declaratory relief relate

United States District Court
Northern District of California

25

exclusively to past conduct—namely, Ironshore's refusal to defend Saarman in 2014—and damages for breach of contract are available to redress that conduct, the Court grants Ironshore's motion for summary judgment with respect to Saarman's claim for declaratory relief.

## CONCLUSION

With respect to Saarman's motion, the Court grants the motion as to Saarman's claim for breach of contract based on Ironshore's duty to defend; denies the motion as to Saarman's claim for breach of contract based on Ironshore's duty to indemnify; and denies the motion as to Saarman's bad faith claim.  With respect to Ironshore's motion, the Court denies the motion as to Saarman's claim for breach of contract; denies the motion as to Saarman's bad faith claim; grants the motion as to Saarman's claim for punitive damages; and grants the motion as to Saarman's claim for declaratory relief.

IT IS SO ORDERED.

Dated:  August 19, 2016

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California