UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAARMAN CONSTRUCTION, LTD, <br>     Plaintiff, <br> v. <br> IRONSHORE SPECIALTY INSURANCE COMPANY, <br>     Defendant. | Case No. 15-cv-03548-JST <br><br> **AMENDED ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**[1] <br><br> Re: ECF Nos. 34, 35, 130 |

Before the Court are Defendant Ironshore Specialty Insurance's Motion for Summary Judgment and Plaintiff Saarman Construction's Motion for Partial Summary Judgment. The Court grants Ironshore's motion and denies Saarman's motion.

## I. BACKGROUND

### A. The Condominium Repairs

The Westborough Court Condominiums, located in the City of South San Francisco, were developed and constructed in the late 1990's. ECF No. 34-5 at 2. Almost immediately after construction, the condominiums experienced significant water intrusion and resultant damage. Id. In 2006, the Westborough Court Condominiums Homeowner's Association retained Plaintiff Saarman Construction to be the general contractor responsible for conducting various repairs to the exterior of the buildings. Id. Saarman subsequently performed this remedial construction work at the property in 2006 and 2007. See id.; ECF No. 1 at ¶ 14.

### B. The Underlying Action

John and Stella Lee owned a unit in the Westborough Court Condominiums. ECF No. 34-

---

[1] This order amends the Court's prior order, ECF No. 87, to reflect the Court's grant of Ironshore's motion for reconsideration, ECF No. 130. The Court granted the motion for reconsideration by separate order.

5 at 34, ¶ 5. The Lees leased the unit to Tiffany Jane Molock. Id. at ¶ 6. At some point, Molock found mold in her unit.[2] In 2011, Molock sued the Lees, the Homeowner's Association, and other defendants in San Mateo County Superior Court. See id. at 6. She sought damages for several defects in the unit, including mold, plumbing leaks, and water intrusion. Id. at 9, ¶ 13. Molock eventually settled her claims. ECF No. 34-6 at 5.

The Lees subsequently cross-claimed against Saarman, the Homeowners Association, and the owners of two neighboring units. See ECF No. 34-5 at 32. The Lees' cross-complaint alleged that Saarman and its sub-contractors negligently performed repair work to the building, resulting in water intrusion and water damage to the interior of their unit that contributed to mold growth. ECF No. 34-5 at 43, ¶¶ 34-35 (noting "resulting omnipresent conditions of mold, toxic mold, and biological growth within the perimeter of the building"); ECF No. 34-5 at 54, ¶ 71 ("The cross-defendants' agents and contractors failed to perform and render services to the building . . . and said failures foreseeably caused water and moisture intrusions into the property resulting [sic] the formation of and amplification of toxic mold within the building."); ECF No. 34-5 at 55, ¶ 75 ("As a proximate result of the cross-defendants continuing and intentional trespasses of water and moisture to the property, toxic mold has developed within the property resulting in it being uninhabitable."). The Lees claimed both bodily injury and property damage. See id. at 51, ¶ 64 (alleging that the cross-defendants' negligence "deprived the Lees of the safe, healthy and comfortable use of the property [and] were injurious to the health of occupants of the property"). The Lees alleged that they discovered the water damage in June 2011, when they had an environmental firm investigate the property. Id. ¶¶ 24-25. In addition, the Lees requested that Saarman and the other cross-defendants indemnify them against any damages ultimately recovered by Molock. ECF No. 34-5 at 62-63, ¶¶ 104-106. The Homeowner's Association filed a similar cross-complaint against Saarman, seeking indemnification and contribution from Saarman. ECF

---

[2] The parties dispute when Molock first discovered mold in her apartment. Ironshore argues that, according to Molock's complaint, Molock first discovered mold in her apartment in December 2009. ECF No. 34 at 11; see also ECF 34-5 at 10, ¶ 15. Saarman argues that, according to the Lees' cross-complaint, Molock did not observe any mold until September 14, 2010. See ECF No. 66 at 4; see also ECF No. 34-5 at 37, ¶ 16.

2

No. 34-7 at 4-6, ¶¶ 4, 6.  Saarman eventually contributed $65,000 to settle the Lees' and the HOA's claims.  ECF No. 34-2 at 17-18.

### C. The Ironshore Insurance Policy

Ironshore issued Saarman a commercial general liability policy for the policy period of June 30, 2010 to June 30, 2011.  See ECF No. 34-4 at 3.  Under this agreement, Ironshore agreed to indemnify Saarman for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Id. at 6.  Ironshore also agreed that it would have the "duty to defend the insured against any 'suit' seeking those damages."  Id.  The policy covered "bodily injury" and "property damage" that (1) "is caused by an 'occurrence,'" and (2) "occurs during the policy period."  Id.  In turn, the policy defined "occurrence" as "an accident, including continuing or repeated exposure to substantially the same harmful conditions."  Id. at 18.  In addition, the policy covered "completed operations"—that is, "all 'bodily injury' and property damage' . . . arising out of . . . 'your product' or 'your work' except . . . work that has not yet been completed or abandoned.  ECF No. 34-4 at 3, ¶ 4; ECF No. 34-4 at 18, ¶ 16.

The policy includes two coverage exclusions that are potentially relevant to this dispute.  First, it contains the following "Mold, Fungi or Bacteria Exclusion" ("Mold Exclusion"), located in an endorsement separate from the main body of the policy:

> Notwithstanding anything to the contrary contained in the policy or any endorsement attached thereto, this insurance does not apply to and shall not respond to any claim, demand, or "suit" alleging:
>
> 1. "Bodily Injury," "Property Damage," or "Personal and Advertising Injury" arising out of, in whole or in part, the actual, alleged, or threatened discharge, inhalation, ingestion, dispersal, seepage, migration, release, escape or existence of any mold, mildew, bacteria or fungus, or any materials containing them, at any time.
>
> 2. . . . ; or
>
> 3. [A]n obligation to contribute to, share damages with, repay or indemnify someone else who must pay damages, loss, cost or expense because of "Bodily Injury," "Property Damage," or

3

"Personal and Advertising Injury" as set forth in 1., 2.a., or 2.b. above.

Id. at 41. In turn, the contract defines a "suit" as "a civil proceeding in which damages because of 'bodily injury' [or] 'property damage' . . . to which this insurance applies are alleged." Id. at 19.

Second, the policy includes the following "Continuous or Progressive Injury or Damage Exclusion" ("CP Exclusion"):

> This insurance does not apply to any "bodily injury" or "property damage":
>
> 1. which first existed, or is alleged to have first existed, prior to the inception of this policy. "Property damage" from "your work," or the work of any additional insured, performed prior to policy inception will be deemed to have first existed prior to the policy inception, unless such "property damage" is sudden and accidental and takes place within the policy period [sic] ; or
>
> 2. which was, or is alleged to have been, in the process of taking place prior to the inception date of this policy, even if such "bodily injury" or "property damage" continued during this policy period; or
>
> 3. which is, or is alleged to be of the same general nature or type as a condition, circumstance or construction defect which resulted in '"bodily injury" or "property damage" prior to the inception date of this policy.

Id. at 32.

### D.    Saarman's Tender and Ironshore's Denial

Saarman's attorney, Paul Lahaderne, notified Ironshore's third-party claims administrator about the Molock cross-complaints in a letter sent on February 3, 2014.[3] See ECF No. 34-5 at 2.

---

[3] Saarman had a separate insurance policy with American Safety Indemnity Company that covered mold-related claims. See ECF No. 34-2 at 40, 69 (agreeing to "pay for 'loss' applicable, associated or in connection with 'mold, mildew, or fungus'"). Before Lahaderne tendered the Molock cross-complaints to Ironshore, he tendered them to the claims adjuster for American Safety Indemnity Company on January 13, 2014. See ECF No. 34-2 at 25 (acknowledging that Saarman's counsel tendered the claim to American Safety Indemnity Company on January 13, 2014). However, American Safety Indemnity Company denied coverage because Saarman failed to report the claim before the end of the policy term. See id. at 73, 80. American Safety Indemnity Company is not a party to the present action.

4

Lahaderne told the claims administrator that "Ms. Molock did <u>not</u> name Saarman Construction as a defendant," and that "Ms. Molock's claims regarding the mold on the <u>interior</u> walls have no causal connection to the reconstruction work performed by Saarman on the exterior building envelope." <u>Id</u>. at 3. He further notified the claims administrator that the Lees' cross-complaint alleged that Saarman's construction activities "resulted in mold infestation in the unit interior." <u>Id</u>. at 4-5. In addition to mold damage, Lahaderne informed the claims' administrator that the Lees alleged that Saarman's repair work had caused a water leak in the northwest corner of the kitchen that caused property damage as a well as a "threshold leak." <u>Id</u>. Lahaderne, however, disputed that Saarman's work to the exterior of the building caused the water intrusion and mold-related damage to the interior of the building. <u>See id</u>. Lahaderne attached both Molock's initial complaint and the Lees' cross-complaint to the letter. <u>See id</u>. at 6, 32. Lahaderne subsequently responded to the claim examiner's requests for more information and provided supplemental documentation related to the <u>Molock</u> action, including the Homeowner's Association's cross-complaint. <u>See</u> ECF Nos. 34-6; 34-7.

On August 21, 2014, Ironshore informed Saarman that it refused to defend or indemnify Saarman in the <u>Molock</u> action. ECF No. 34-9 at 3. Ironshore declined coverage based on both the Mold Exclusion and CP Exclusion in the policy. <u>Id</u>. at 8-9. First, Ironshore explained that Saarman completed its work on the properties prior to the policy inception date and, therefore, coverage was excluded by the CP Exclusion. <u>Id</u>. at 8. Second, Ironshore explained that coverage was independently excluded by the Mold Exclusion because Molock alleged in her complaint that she sustained personal injury and property damage caused by the presence of mold in her unit. <u>Id</u>. at 9.

### E. Procedural History

On July 31, 2015, Saarman filed the present action against Ironshore. ECF No. 1. Saarman's Complaint alleges that Ironshore improperly refused to provide Saarman with a defense regarding the two cross-complaints in the <u>Molock</u> action. <u>Id</u>. at ¶ 36. Saarman asserts that Ironshore's refusal to defend was a breach of contract and a breach of the implied covenant of good faith and fair dealing. <u>Id</u>. at ¶¶ 45, 53. Saarman also seeks a declaration that Ironshore has a

duty to defend Saarman. Id. at 64.

## II.  JURISDICTION

This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332(a)(1) because the named parties are diverse and the amount in controversy exceeds $75,000. ECF No. 1, ¶¶ 1, 2, 5.

## III.  LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(A). A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir.1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir.2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire &

1  Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir.2000).

2  The non-moving party must "identify with reasonable particularity the evidence that
3  precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996). It is not the
4  duty of the district court to "to scour the record in search of a genuine issue of triable fact." Id.
5  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for
6  summary judgment; rather, the nonmoving party must introduce some significant probative
7  evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150,
8  1152 (9th Cir.1997) (citation and internal quotation marks omitted). If the non-moving party fails
9  to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v.
10 Catrett, 477 U.S. 317, 323 (1986).

**IV.   ANALYSIS**

Saarman has asserted three claims against Ironshore: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) claim for declaratory relief that Ironshore has a duty to defend Saarman. Ironshore moves for summary judgment in its favor on all three claims, and Saarman moves for summary judgment in its favor with respect to the first two claims. The Court will address each of the claims in turn.

**A.   Breach of Contract Claims**

**1.   Duty to Defend**

First, Saarman argues that Ironshore owed Saarman a duty to defend it in the underlying construction defect action, and that Saarman accordingly breached its contract with Saarman by refusing to defend it. In response, Ironshore argues that it did not have a duty to defend Saarman in the underlying action because either the Mold Exclusion or the CP Exclusion negated any potential coverage.

An insurer has a duty to defend its insured against claims that are potentially covered under the insurance policy. See Horace Mann Ins. Co. v. Barbara B., 4 Cal.4th 1076, 1081 (1993); Gray v. Zurich Ins. Co., 65 Cal.2d 263, 275 (1966) ("[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy."). This duty to defend is "measured by the nature and kinds of risks covered by the policy." Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1,

7

19 (1995), as modified on denial of reh'g (Oct. 26, 1995). "[W]here there is no potential for coverage, there is no duty to defend." La Jolla Beach & Tennis Club, Inc. v. Indust. Indem. Co., 9 Cal.4th 27, 39 (1994). "The burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage." Aydin Corp. v. First State Ins. Co., 18 Cal. 4th 1183, 1188 (1998), as modified on denial of reh'g (Oct. 14, 1998). "And, once an insured has made this showing, the burden is on the insurer to prove the claim is specifically excluded." Id. If met, the burden shifts back to Saarman to prove that an exception to the exclusion nevertheless affords coverage. Id. at 1194.

To determine whether there was potential coverage, and thus a duty to defend, courts generally compare the allegations in the underlying complaint with the terms of the insurance policy. See Montrose Chem. Corp. v. Superior Court, 6 Cal. 4th 287, 295 (1993). However, "facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." Id. By the same token, extrinsic evidence may defeat the duty to defend if "such evidence presents undisputed facts which conclusively eliminate a potential for liability." Id. at 298-99 (internal quotation marks omitted). In other words, "[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage." Scottsdale Ins. Co. v. MV Transp., 36 Cal. 4th 643, 655 (2005). "On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." Id. "[T]he duty to defend is determined by the information possessed by the insurer at the time it refuses to defend, not by information subsequently obtained." Amato v. Mercury Cas. Co., 18 Cal. App. 4th 1784, 1787 (1993).

If the insurer had a duty to defend, that duty "continues 'until [the insurers] can conclusively refute th[e] potential' that liability will arise under the policies." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Seagate Techs., Inc., 466 F. App'x 653, 655 (9th Cir. 2012) (quoting Montrose, 24 Cal.Rptr.2d 467). This places a "high burden" on the insurer. Id. A defense is excused only when "the third party complaint can by no conceivable theory raise a single issue

8

which could bring it within the policy coverage." Montrose, 6 Cal.4th at 295. "[T]he insured need only show that the underlying claim may fall within the policy coverage; the insurer must prove it cannot." Id. at 300. On a motion for summary judgment on the insurer's duty to defend, an insurer must be able to negate coverage as a matter of law. Maryland Cas. Co. v. Nat'l Am. Ins. Co of Calif., 48 Cal. App. 4th 1822, 1832 (1996).

When interpreting an insurance policy to determine potential coverage, courts apply "the ordinary rules of contractual interpretation." Bank of the W. v. Superior Court, 2 Cal. 4th 1254, 1264 (1992). "If contractual language is clear and explicit, it governs." Id. (citing Cal. Civ. Code, § 1638); see also Buss v. Superior Court, 16 Cal. 4th 35, 45, 939 P.2d 766 (1997) ("Where it is clear, the language must be read accordingly."). If the contractual language is ambiguous, "it must be read in conformity with what the insurer believed the insured understood thereby at the time of formation and, if it remains problematic, in the sense that satisfies the insured's objectively reasonable expectations." Buss, 16 Cal. 4th at 45; see also Gray, 65 Cal. 2d at 269 ("In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect."). California courts "do not add to, take away from, or otherwise modify a contract for public policy considerations." Aerojet-Gen. Corp. v. Transp. Indem. Co., 17 Cal. 4th 38, 75-76 (1997) (internal quotation marks omitted), as modified on denial of reh'g (Mar. 11, 1998).

### a. What to Consider in the Duty to Defend Analysis

As a preliminary matter, Saarman argues that "[t]he allegations of mold in the Molock complaint are irrelevant and immaterial to Ironshore's duty to defend Saarman as to either the Lee cross-complaint or the HOA [Homeowner's Association] cross-complaint" because Saarman was not named as a defendant in the Molock complaint. ECF No. 35 at 17-18. The Court finds this argument unpersuasive. Even if the Molock complaint did not name Saarman as a defendant, Ironshore was allowed to consider "facts extrinsic to the complaint," including the underlying allegations that prompted the Lees and the Homeowner's Association to seek indemnification from Saarman, to determine whether there was potential coverage. Montrose, 6 Cal. 4th 287 at

9

298-99. The Court therefore considers both the allegations in the cross-complaints against Saarman and the extrinsic evidence available to Ironshore at the time to determine whether Ironshore had a duty to defend Saarman.

### b. Basic Scope of Coverage

Saarman has introduced evidence showing that the cross-complaints included allegations of water intrusion and water damage resulting from Saarman's repair work that was within the basic scope of coverage. The Lees' cross-complaint alleged that Saarman negligently repaired the exterior of the building and, as a result, this caused water intrusion and property damage. ECF No. 34-5 at 43, ¶¶ 34-35, 71. As early as February 3, 2014, Lahaderne informed Ironshore that "the Lees' experts have and [sic] presented evidence that there are at least 2-3 areas of water intrusion due to deficiencies in work performed by Saarman (and/or subcontractor Shapiro Plastering), which have resulted in tangible property damage to the unit interiors and fixtures." ECF No. 34-7 at 3. In a subsequent letter sent to Ironshore on March 28, 2014, Lahaderne informed Ironshore that there was "water intrusion into her unit with resultant property damage." ECF No. 34-6 at 5. And, based on expert opinions, Lahaderne informed Ironshore that "[t]here is clear evidence of water intrusion which appears at this location." ECF No. 34-6 at 9. These claims for water damage clearly fell within the basic scope of coverage under Ironshore's policy, which covers sums that Saarman became obligated to pay because of "property damage" caused by an occurrence that occurred during the policy period. See ECF No. 34-4 at 3. As a result, the burden shifted to Ironshore to prove that this claim was specifically excluded and therefore, that there was no potential coverage under the policy. Aydin, 18 Cal. 4th at 1188.

### c. Mold Exclusion

First, Ironshore argues that the Mold Exclusion eliminated any potential coverage for Saarman's claim such that there was no duty to defend. ECF No. 34 at 17. Ironshore points out that the Mold Exclusion broadly bars coverage for "any claim, demand, or 'suit' alleging . . . 'Bodily Injury,' [or] 'Property Damage'. . . arising out of, in whole or in part, the actual, alleged, or threatened . . . existence of any mold. . . ." Id. Ironshore argues that this exclusionary language clearly and unmistakably bars any potential coverage not just for "claims" that include mold

10

1   allegations, but also any "suit" that includes mold allegations, either in whole or in part. Id. at 17.
2   Because the Molock action was such a "suit,"[4] Ironshore argues that the Mold Exclusion applies,
3   thus eliminating any possibility of coverage with respect to the entire underlying "suit." Id. at 17-
4   19.
5       In response, Saarman argues that the Mold Exclusion did not relieve Saarman of its duty to
6   defend because the cross-complaints also included claims for water intrusion and water damage,
7   separate and apart from the mold damage, that were potentially covered under the policy. ECF
8   No. 66 at 10, 12-13. Based on the water intrusion claim, Saarman argues that Ironshore had a duty
9   to defend the *entire* underlying action, including the uncovered mold claim. Id. at 10-11. To
10  support its argument, Saarman relies primarily on cases in which the California Supreme Court
11  has held that "[o]nce the defense duty attaches, the insurer is obligated to defend against all of the
12  claims involved in the action, both covered and noncovered." Horace Mann Ins. Co. v. Barbara
13  B., 4 Cal. 4th 1076, 1081, 1084 (1993), as modified on denial of reh'g (May 13, 1993) ("We look
14  not to whether noncovered acts predominate in the third party's action, but rather to whether there
15  is *any* potential for liability under the policy.").
16      There is some tension between the plain terms of the insurance contract—which clearly bar
17  coverage for any "suit" that includes mold allegations, even if there are other potentially covered
18  claims within that suit—and California case law which holds that insurers have a duty to defend a
19  mixed action if there is any potentially covered claim, even if the action includes uncovered
20  claims. On the one hand, California courts enforce clear and explicit contractual language
21  contained in insurance exclusions. Bank of the W., 2 Cal. 4th at 1264 (citing Cal. Civ. Code, §

---

[4] Both Molock's complaint and the Lees' cross-complaint included mold allegations. See, e.g., ECF No. 34-5, Ex. 2 at 55, ¶¶ 71, 75 (alleging that "[t]he cross-defendants' agents and contractors failed to perform and render services to the building and devices therein . . . and said failures foreseeably caused water and moisture intrusions into the property resulting [sic] the formation of and amplification of toxic mold within the building . . . As a proximate result of the cross-defendants continuing and intentional trespasses of water and moisture to the property, toxic mold has developed within the property resulting in it being uninhabitable."). Saarman's defense counsel admitted as such in his deposition. See ECF No. 34-2, Ex. 2 at 13:18-23 (responding "I believe that's correct" after being asked whether "the Lees made the claim that Saarman was somehow responsible for the mold in Ms. Molock's unit").

11

1638).  On the other hand, the California Supreme Court has held that in a "mixed action"—i.e. an action that includes both potentially covered and uncovered claims—"the insurer has a duty to defend the action in its entirety."  Buss, 16 Cal. 4th at 48.  This is so because the *claim*, and not the entire lawsuit, is the proper unit of analysis for determining whether the duty to defend is triggered.  See id. ("As stated, the duty to defend goes to any action seeking damages for any covered claim.  If it went to an action *simpliciter*, it could perhaps be taken to reach the action *in its entirety*.  But it does not.").  And this "prophylactic[]" duty to defend mixed actions prevents insurers from wasting time dividing potentially covered claims from uncovered claims in a way that would hamper an immediate and meaningful defense.  Id. at 48-49.

At oral argument on these motions, the parties acknowledged that California courts have not squarely addressed the effect that a mold exclusion like the one at issue—which bars coverage for any "suit," not just any "claim," in which mold damages are alleged, either in whole or in part—has on otherwise covered claims.[5]  This Court must therefore determine how the California Supreme Court is likely to decide this state law issue of first impression.  See In re K F Dairies, Inc. & Affiliates, 224 F.3d 922, 924 (9th Cir. 2000).

The Court finds the reasoning in Mount Vernon Fire Ins. Co. v. Creative Housing, Ltd. persuasive on this issue.  88 N.Y. 2d 347 (N.Y. Ct. App. 1996).  In that case, a woman who was assaulted in an apartment building sued the owner of the building for negligence.  Id. at 349-50.  In turn, the building owner sought defense and indemnification in the underlying suit from its insurer.  Id.  The insurer sued in federal district court seeking declaratory judgment that it did not owe the building owner a duty to defend, relying on language in its policy that excluded coverage "for any claim, demand or suit based on Assault and Battery."  Id. at 350.  On appeal, the Second

---

[5] The broad exclusionary language in this Mold Exclusion—which bars coverage in any suit in which mold-related damage is alleged, not just coverage for mold-related damages—distinguishes this case from the cases cited by Saarman.  Cf. Schmitt v. NIC Ins. Co., No. C 06-5837 MHP, 2007 WL 3232445, at *2, n. 7 (N.D. Cal. Nov. 1, 2007) (providing that "[t]his insurance does not apply to: 'Bodily injury,' 'property damage,' . . . arising out of, resulting from, or caused by or contributed to by any fungus, mildew, or mold"); Tower Ins. Co. v. Dockside Associates Pier 30 LP, 834 F. Supp. 2d 257, 264-65 (E.D. Pa. 2011) ("[T]he mold exclusion does not act as a complete bar to coverage, but only excludes coverage for damage caused by mold.").

1  Circuit certified several issues of state law to the New York Court of Appeal. Id. at 350-51. The
2  New York Court of Appeal applied a "but-for" test to the exclusion: "if no cause of action would
3  exist but for the assault, the claim is based on assault and the exclusion applies." Id. In other
4  words, the exclusion applied if "the negligence claim could not be established without proving the
5  underlying assault." Id. at 351-52. The court reasoned that, although the plaintiff had alleged
6  negligence (a covered claim), that cause of action would not have existed but for the assault (an
7  uncovered claim). Id. Therefore, the court concluded that the "claim [was] based upon an assault
8  for which coverage is excluded." Id.

9  Ironshore acknowledges that the assault and battery exclusion in Mount Vernon "has some
10 similarities with the Ironshore mold exclusion." ECF No. 81 at 3-4. Notably, both exclusions use
11 the phrase "claim, demand, or suit." Id. However, Ironshore argues that Mount Vernon should
12 not apply here for two reasons. Id. First, Ironshore argues that the New York court applied the
13 "but-for" test to determine what the suit was "based on." Id. Ironshore argues that such a
14 determination is not necessary in this case because coverage under its policy does not hinge on
15 what the suit is "based on." Id. Rather, Ironshore's policy bars coverage for any suit that alleges
16 mold-related damages either "in whole or in part." Id. Second, Ironshore argues that Mount
17 Vernon does not apply because California courts have adopted a broader definition of "arising out
18 of" than New York courts. Id. at 4. Neither argument is persuasive.

19 To the extent Ironshore relies on the language in the Mold Exclusion to evade its duty to
20 defend mixed actions that include covered claims, that language contradicts California law. As the
21 California Supreme Court explained in Buss, "in a 'mixed' action, the insurer has a duty to defend
22 the action *in its entirety*." Buss, 16 Cal. 4th at 48 (emphasis added). Here, Ironshore has
23 attempted to circumvent that principle by hinging its duty to defend on the presence of any
24 allegations of non-covered damage in the "suit"—no matter how small or inconsequential those
25 allegations may be. However, the court in Buss suggested that insurers could not contract around
26 their duty to defend mixed actions in this way. The court explained that this obligation is not even
27 rooted in the contractual language itself, but rather is "imposed by law in support of the policy."
28 Id.; see also State Farm Gen. Ins. Co. v. Mintarsih, 175 Cal. App. 4th 274, 286 (2009) ("[T]he

13

duty to defend claims in a 'mixed' action that are not potentially covered is not a contractual duty."). In short, Ironshore cannot contract around California law that requires insurers to defend the entire action if there is any potentially covered claim. Because the language in the mold exclusion barring coverage for "any claim, demand, or 'suit' alleging [damage] arising out of, in whole or in part, the . . . alleged . . . existence of any mold" tries to do precisely that, it is unenforceable.

The "but-for" test also has close parallels to other facets of California insurance law. For example, California courts require coverage when two negligent acts on the part of the insured— one covered and one not covered—concurrently cause damages for which the insured seeks indemnification. See State Farm Mut. Auto. Ins. Co. v. Partridge, 10 Cal. 3d 94, 98, 102, 104-05 (1973).[6] In Partidge, for example, the California Supreme Court held that the insurer was liable where the insured's negligent modification of a gun to have a "hair trigger action" (a covered act) and the insured's negligent driving (a non-covered act) simultaneously caused a passenger in the car to be shot. Id. The court explained that "although the accident occurred in a vehicle, the insured's negligent modification of the gun suffices, in itself, to render him fully liable for the resulting injuries." Id. at 103. In other words, the plaintiff in the underlying negligence suit would have had a cause of action even if the insured had not engaged in uncovered conduct—i.e. the insured's liability existed "independently" of the uncovered conduct. Id. The court further explained that the insurer was "attempting to escape liability under the homeowner's policy simply because, in the instant case, both negligent acts happened to have been committed by a single tortfeasor." Id. The same rationale applies here, and even if Saarman's conduct is categorized as a single negligent act that results in two categories of damages – one category that

---

[6] Saarman also relies on Howell v. State Farm Fire & Casualty Co., 218 Cal. App. 3d 1446 (1990). However, shortly before that case was decided the California Supreme Court held that the concurrent proximate cause doctrine only applies to third party liability cases, not first-party property policy cases like Howell. See Garvey v. State Farm Fire & Cas. Co., 48 Cal. 3d 395, 399, 410 (1989) (recognizing "the important distinction between property loss coverage under a first-party property policy and tort liability coverage under a third-party liability insurance policy" and holding that the lower court "erroneously failed to limit at the threshold the application of *Partridge* to the third party liability context"). Therefore, the Court does not consider the Howell case in its analysis.

is covered and one category that is not covered – there is no reason not to apply the same analysis. The "but-for" test prevents insurers from escaping their duty to defend mixed actions simply because the negligent act happened to result in uncovered damage as well as covered damage. In sum, the "but-for" test balances the undisputed need to enforce the clear contractual language of a policy exclusion, on the one hand, with California law that requires insurers to defend the entire action if there is a potentially covered claim, on the other hand. Therefore, the Court applies the "but-for" test to the case at hand.

Applying the "but-for" test to the Mold Exclusion at issue in this case, Ironshore had a duty to defend Saarman in the underlying suit based on the potentially covered water intrusion/water damage claim. This is because the Lees' cause of action for negligence against Saarman for water intrusion and damage would have existed even if there were no mold allegations—i.e. it exists "independently" of the mold allegations. In other words, the Lees could have established a negligence claim against Saarman based on water intrusion/water damage alone (which is potentially covered) without proving mold damage (which is not covered). Because the water damage claim was potentially covered, the duty to defend attached and Ironshore "is obligated to defend against all of the claims involved in the action, both covered and noncovered." Horace Mann, 4 Cal. 4th at 1081. Ironshore may not evade this duty to defend simply because Saarman's covered negligent act happened to result in allegations of mold damage as well as water damage. Such a result would frustrate the reasonable expectations of policy holders by depriving them of their contractual right to a defense for potentially covered claims simply because the plaintiff in the underlying suit decided to include additional allegations of damage that are not covered under the policy.

### d. CP Exclusion

Second, Ironshore argues that the policy's CP exclusion barred any potential coverage and therefore negated any duty to defend. ECF No. 34 at 19-24. The Court agrees.

Paragraph 1 of the CP exclusion bars coverage for "continuous or progressive injury or damage" which "first existed, or is alleged to have first existed, prior to the inception of this policy." ECF No. 34-4 at 32. That paragraph also states that damage resulting from the insured's

work "performed prior to policy inception *will be deemed to have first existed prior to the policy inception*, unless such 'property damage' is sudden and accidental and takes place within the policy period." Id. (emphasis added).  Ironshore argues that it is undisputed that Saarman completed its work on the project no later than 2007, while the inception date of the Ironshore policy is June 30, 2010.  ECF No. 34 at 19-24.  Therefore, Ironshore argues, the water intrusion damage is deemed to have first existed prior to the policy period and there is no potential for coverage.  See id.; see also ECF No. 65 at 13.

       Saarman does not dispute that it finished its repair work on the property by 2007 at the latest, several years before the policy inception date of June 30, 2011.  ECF No. 1 at ¶ 14; ECF No. 66 at 16.  Therefore, regardless of when the damage resulting from that work first existed or was alleged to have first existed, the CP exclusion automatically deems that damage to have first existed prior to the policy inception, and excludes coverage unless the damage was "sudden and accidental."  ECF No. 34-4 at 32.

       Saarman does not argue that the water damage was sudden and accidental.  Instead, Saarman argues that: (1) the CP exclusion does not apply because the water damage was not "continuous" or "progressive," but rather "intermittent" based on rainfall; (2) the deemer clause in the CP exclusion is unenforceable because it renders the Ironshore policy "ambiguous as to the operative event on which property damage coverage is conditioned"; and (3) the deemer clause in the CP exclusion is unenforceable because it operates as "an undisclosed exclusion of 'completed operations' coverage as to work completed before [the] policy period."  ECF No. 66 at 15-17.  All of these arguments fail.

       First, although the heading of the CP exclusion contains the phrase "continuous or progressive," a heading is not an operative term in an insurance contract.  Hervey v. Mercury Cas. Co., 185 Cal. App. 4th 954, 965 (2010).  The operative language in the CP exclusion precludes coverage for any property damage that first existed prior to the policy period or that results from work performed by the insured prior to the policy period.  ECF No. 34-4 at 32.  At the time Ironshore denied coverage, extrinsic evidence provided to Ironshore confirmed that Saarman completed its work on the project in 2007, several years before the policy inception date, thus

16

bringing the underlying claim within the CP exclusion and negating any potential coverage. ECF No. 34-9 at 2. Therefore, the CP exclusion applies to the damage at issue here.

Second, Ironshore's policy is not ambiguous as to the trigger of coverage. The general coverage clause provides that coverage is triggered by damage that occurs within the policy period. ECF No. 34-4 at 3. And the CP exclusion, contained in an endorsement, modifies the underlying policy by clearly and unambiguously excluding coverage for damage that would otherwise be covered if that damage resulted from work performed by the insured prior to policy inception. Id. at 32.

To support its ambiguity argument, Saarman relies primarily on Pennsylvania Gen. Ins. Co. v. American Safety Indem. Co., 185 Cal. App. 4th 1515 (2010). In that case, a California Court of Appeal held that an endorsement modifying the definition of the term "occurrence" was ambiguous because it did not clearly specify whether the causal act or the resulting damage was the operative act triggering potential coverage. Id. at 1526-27. The endorsement modified the policy's definition of a covered "occurrence" in the following way:

> 'Occurrence' means 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions *that happens during the term of this insurance. 'Property damage'* . . . *which commenced prior to the effective date of this insurance will be deemed to have happened prior to, and not during, the term of this insurance.*

Id. at 1525 (emphasis in original). The insurance company argued that this definition of "occurrence" unambiguously required both that the causal *act* occurred during the policy period and that the resulting *damage* occurred during the policy period. Id. at 1526. However, the court found that "[t[he italicized language read as a whole is at least equally susceptible to the interpretation that resulting damage is the defining characteristic of the occurrence." Id. at 1527. Because the endorsement did not "clearly and unambiguously limit coverage to those claims in which the causal acts took place during the policy period," and because there was a factual dispute as to when those damages first commenced, the court reversed the trial court's summary judgment order. Id. at 1527, 1532-34.

However, unlike the endorsement at issue in Pennsylvania General, the language in

17

Ironshore's CP exclusion endorsement clearly and unambiguously excludes coverage for property damage resulting from work performed by the insured prior to policy inception. See Am. Zurich Ins. Co. v. Ironshore Specialty Ins. Co., No. 2:14-CV-00060-TLN-KJ, 2014 WL 3687727, at *5 (E.D. Cal. July 23, 2014) ("Unlike the policy in *Pennsylvania Gen.,* the policy at issue herein is not ambiguous. The policy specifically states that property damage caused by work that was completed prior to the policy's inception is excluded from coverage."). Saarman cannot point to any ambiguity within the language of the endorsement itself. Instead, Saarman tries to manufacture ambiguity by arguing that the deemer clause in the CP exclusion (which conditions coverage on the time the causal act occurred) conflicts with the general coverage clause in the body of the policy (which conditions coverage on the time the resulting damage occurred). ECF No. 66 at 15-16. However, "if there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls." Aerojet-Gen. Corp. v. Transp. Indem. Co., 17 Cal. 4th 38, 50, n. 4 (1997), as modified on denial of reh'g (Mar. 11, 1998) (internal quotation marks omitted) (quoting Continental Cas. Co. v. Phoenix Constr. Co., 46 Cal.2d 423, 431 (1956)). Because the language in the CP exclusion overrides any conflicting language in the body of the policy, there is no such ambiguity.

Nor does the deemer clause in the CP exclusion operate as an undisclosed exclusion on the completed operations coverage. ECF No. 66 at 16-17. As an initial matter, the CP exclusion does not entirely exclude completed operations coverage so as to render that coverage illusory, but rather only excludes completed operations coverage if the work was completed prior to the policy inception. In addition, the CP exclusion endorsement clearly discloses the following: "THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY." ECF No. 34-4 at 32 (emphasis in original). The endorsement goes on to state that it "modifies insurance provided under . . . COMMERCIAL GENERAL LIABILITY COVERAGE PART." Id. These repeated disclosures are "conspicuous, plain and clear," and they apprise the insured that the endorsement modifies coverage provided for elsewhere in the policy, including the completed operations coverage. MacKinnon v. Truck Ins. Exch., 31 Cal. 4th 635, 648 (2003), as modified on denial of reh'g (Sept. 17, 2003).

18

In sum, the CP exclusion in Ironshore's policy is enforceable and applies to the underlying claim. Because Saarman concedes that it finished its repair work on the property by 2007 at the latest, several years before the policy inception date of June 30, 2011, the CP exclusion deems any damage resulting from that work to have first existed prior to the policy period and excludes coverage for that damage unless it was "sudden and accidental." ECF No. 34-4 at 32. Saarman does not argue that the damage was sudden and accidental, and therefore does not meet its burden of showing that it satisfies this exception to the CP exclusion. See Aydin Corp., 18 Cal. 4th at 1188. Because the CP exclusion negates any potential coverage, Ironshore does not have a duty to defend. LaJolla, 9 Cal. 4th at 39. Accordingly, the Court grants Ironshore's motion for summary judgment with respect to this claim.[7]

### 2. Duty to Indemnify

Absent a duty to defend, Ironshore does not have a duty to indemnify. Certain Underwriters at Lloyd's of London v. Superior Court, 24 Cal. 4th 945, 961 (2001). The Court accordingly grants Ironshore's motion for summary judgment with respect to this claim.

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

Absent a predicate breach of contract, an insurer cannot be liable for breach of the implied covenant of good faith and fair dealing. Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 36, 900 P.2d 619, 639 (1995), as modified on denial of reh'g (Oct. 26, 1995) ("It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."). The Court accordingly grants Ironshore's motion for summary judgment with respect to this claim.

### C. Claim for Punitive Damages

Because Saarman has failed to show a genuine issue of triable fact regarding its tort claims, there is no basis for an award of punitive damages. Cont'l Ins. Co. v. Superior Court, 37 Cal. App. 4th 69, 86 (1995).

---

[7] Because the Court finds that paragraph 1 of the CP exclusion negates any potential coverage under the policy, it does not need to address paragraphs 2 or 3 of the CP exclusion.

Case 3:15-cv-03548-JST   Document 136   Filed 01/31/17   Page 20 of 20

### D. Claim for Declaratory Relief

Saarman also seeks a declaration that Ironshore owed Saarman a duty to defend. Because Ironshore did not owe Saarman a duty to defend, as explained above, this cause of action necessarily fails. The Court accordingly grants Ironshore's motion for summary judgment with respect to Saarman's claim for declaratory relief.

## CONCLUSION

The Court grants Ironshore's motion for summary judgment in its entirety, and denies Saarman's motion for partial summary judgment. Because this amended summary judgment order obviates the need for the upcoming jury trial, the Court hereby vacates the trial scheduled to commence on February 6, 2017.

Ironshore is ordered to serve a proposed form of judgment to Saarman within seven days of this order. Saarman may either sign the proposed judgment indicating its agreement as to form, or serve objections on Ironshore within seven days thereafter. Within seven days thereafter, Ironshore must file its proposed form of judgment on the Court, and either (1) incorporate Saarman's requested changes if any, or (2) file Saarman's objections and Ironshore's responses.

IT IS SO ORDERED.

Dated: January 31, 2017

JON S. TIGAR
United States District Judge

20